IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ONEBEACON INSURANCE COMPANY, | : | CIVIL ACTION |
|---|---|---|
| Plaintiff, | : | |
| | : | |
| vs. | : | NO. 10-7498 |
| | : | |
| AVIVA INSURANCE LIMITED, | : | |
| Defendant. | : | |

DuBois, J.                                                                                                May 17, 2013

# M E M O R A N D U M

## I.    INTRODUCTION

This matter arises out of a dispute over what the parties refer to as a reinsurance contract. Plaintiff OneBeacon Insurance Company provided insurance coverage in the United States to various policyholders, and defendant Aviva Insurance Limited reinsured those liabilities. After defendant refused to cover a large number of claims submitted by plaintiff for various reasons, the instant litigation was filed. Presently before the Court are defendant's Motion for Partial Summary Judgment and plaintiff's Motion for Summary Judgment.

For the reasons stated below, both motions are denied in part and granted in part.

## II.   BACKGROUND

Although the parties have a complicated and intertwined corporate history, a detailed examination is unnecessary to resolve the pending motions. In brief, defendant's predecessor-in-interest, a British company, ("UK Entity") assumed the risk of insurance policies issued by plaintiff's predecessor-in-interest, an American company ("US Entity"). (Stipulation at ¶¶ 15, 22-23.)

### A.    Reinsurance Agreement

Around 1997, the UK Entity and the US Entity reaffirmed their agreement, in which the UK Entity "reinsured 100% of the liabilities of the US Entity arising under" the US Entity's

insurance policies to Global Risk accounts.  (Stip. at ¶¶ 26-27.)  That agreement, referred to as the "GA Agreement," was never memorialized in writing, but the parties agree that it is a valid and binding agreement.  (Stip. at ¶¶ 28-29.)  The parties exchanged several draft agreements, and although a written version was never executed, the parties have stipulated that the GA Agreement would include certain standard clauses and provisions that are customary in reinsurance contracts.  (Stip. at ¶¶ 34-35, 85.)  Further, both parties agree that the GA Agreement includes, *inter alia*, a follow-the-fortunes provision and an errors and omission provision.  (Defendant's Supplemental Answers and Objections to the First Set of Interrogatories of OneBeacon at ¶ 3.)

Prior to 2001, "the UK Entity did not precondition payment on any documentation requirements other than the submission of bordereaux[1] which were validated by UK Entity.  The US Entity did at time provide information and/or documentation in addition to the bordereaux."  (Stip. at ¶ 44.)  Starting in 2002, RMI – "an agent for [defendant] with respect to determining the liabilities of [defendant to plaintiff] with respect to" the policies at issue in this case – began to require additional documentation from plaintiff before validating claims for payment.  (Stip. at ¶¶ 16, 45, 92-93.)  Although plaintiff never provided express verbal or written agreement to this new requirement, it did provide "some of the requested documentation to RMI."  (Stip. at ¶¶ 46-47, 98-99.)

### B. "Catch-Up" Billings

Prior to 2001, the two parties shared an internal accounting system to make payments.  (Stip. at ¶ 51.)  Due to mergers and corporate restructuring at the US Entity, after 2001 the US

---

[1] According to plaintiff, a "bordereau" is "… a detailed report of reinsurance premiums or reinsurance losses … furnished periodically by the reinsured. … A loss bordereau contains a detailed list of claims and claims expenses outstanding and paid by the reinsured during the reporting period, reflecting the amount of reinsurance indemnity applicable thereto."  (Pl.'s Mot. at 5 n.7; Pl. Exhibit D.)

2

Entity manually billed the UK Entity and payments were made via a direct transfer of money. (Stip. at ¶ 51; Pl. Exhibit K.) Plaintiff contends that after a corporate merger in 1998, certain bills were not fully conveyed to defendant and that this failure was not discovered until 2005. (Pl. Exhibit K.) Defendant contends that plaintiff knew of problems with the billings for such insurance coverage as early as 1998, but did not properly investigate the situation.

In 2005, plaintiff eventually determined that it had failed to bill defendant certain amounts since 1999, and it prepared two "catch-up" billings. The May 2005 billing totaled $2,337,346.37. (Def.'s Exhibit 27.) The June 2005 billing totaled $17,988,760.79. (Def. Exhibit 28.) Most of the claims in these two "catch-up" billings were new to defendant. (Stip. at ¶ 88.) The two "catch-up" billings were submitted to defendant in July 2005. (Stip. at ¶ 87.)

On July 28, 2006, plaintiff notified defendant that it had more unbilled claims it needed to submit, which had been handled by a third-party. (Stip. at ¶ 89.) This 2006 "catch-up" billing totaled approximately $4,400,000 and was submitted in October 2006. (Def. Exhibits 42-43.)

**C.  Standstill Agreement**

In early August 2006, the parties began to negotiate a standstill agreement, whereby the statute of limitations would be tolled in relation to the May and June 2005 "catch-up" billings. (Stip. at ¶ 90; Def. Exhibit 45.) After exchanging drafts, the parties agreed to the following language, in relevant part:

> AND WHEREAS: A dispute or potential dispute has arisen between the Parties regarding the Fronting Policies in respect to [plaintiff's] May and June 2005 bordereaux.
> IT IS AGREED as follows: … 3. Save as set out in paragraph 5 below, for the purposes of any statutory limitation … which may be applicable to proceedings between the Parties arising out of or relating in any way whatsoever to the Fronting Policies, the Parties agree that from the date hereof until 30 days after termination of this Agreement time shall not be treated as having continued to run for the purposes of any defence or doctrine of time-bar, limitation of action, prescription, laches or delay or any similar defence or doctrine in law or equity under any relevant system of law, in relation to all causes of action which may arise or may already have at any time arisen out of or in

connection with the dispute under the Fronting Policies, whether the relevant causes of action arise in law or equity, contract or tort or otherwise howsoever.

(Def. Exhibit 53.) Although signed by the parties in September 2006, the standstill agreement was retroactively effective as of August 3, 2006. (Id.) On November 24, 2010, plaintiff notified defendant that it was terminating the standstill agreement, effective December 24, 2010. (Def. Exhibit 60.)

### D. Delamination Claims

The parties also have a dispute over the so-called Delamination claims. One of plaintiff's accounts is Burmah Castrol, which is the parent company of Columbia Cement Company, Inc. (Stip. at ¶¶ 55, 59.) Columbia Cement manufactured a glue, named "ConBond 330," which was used in furniture. (Stip. at ¶¶ 60, 63.) The glue did not bond properly, which caused separation – or delamination – of the glued materials, which in turn caused damage to personal and commercial property. (Stip. at ¶¶ 60, 63.) The damage manifested after the application of the glue, and litigation against Columbia Cement was initiated. (Stip. at ¶¶ 60, 64, 66.) Additionally, Burmah Castrol made claims under its policy with the US Entity. (Stip. at ¶ 65.) By May 2001, approximately 1,539 Delamination claims were reported. (Stip. at ¶ 68.)

In 1999, US Entity sought the legal assistance of an outside law firm on the Delamination claims. (Stip. at ¶ 69-70.) The US Entity and Burmah Castrol differed over the trigger for policy coverage for the Delamination claims. (Stip. at ¶ 74.) US Entity advocated for a manifestation trigger, meaning it believed policy coverage began from the manifestation of the damage due to the glue not bonding properly. (Id.) Burmah Castrol advocated for an application trigger, meaning it believed policy coverage began from the application of the glue to the materials. (Id.) In response to that dispute, the law firm offered an opinion letter in April 1999, which was "inconclusive as to both jurisdiction and policy trigger issues." (Stip. at ¶ 71.) Despite the

4

inconclusive nature of the legal opinion, the issue of the trigger for policy coverage was unimportant at that time because coverage existed from June 1989 and therefore covered claims regardless of the policy trigger theory. (Stip. at ¶ 57.) However, on June 30, 2001, the coverage was non-renewed. (Stip. at ¶ 78.) After the non-renewal, the trigger for policy coverage was important to determine how many subsequent claims would be covered by the policy: an early trigger (i.e. application of the glue) would result in more claims being covered than a late trigger (i.e. manifestation of damage).

Despite the uncertainty regarding the trigger for policy coverage, Burmah Castrol continued to submit Delamination claims, and the US Entity continued to settle those claims. (Stip. at ¶ 81.) The parties disagree about the reasonableness of the decision by the US Entity that the new claims were within the coverage, but defendant does not claim that plaintiff acted in bad faith or collusively. (Stip. at ¶ 79, 81-82, 106.)

### E. Denied Claims

The instant suit was filed on December 27, 2010. Plaintiff argues that defendant has wrongfully refused to pay approximately $13 million in claims, as of April 13, 2012. (Stip. at ¶ 100.) Approximately $10 million of those refused claims were denied based on the bar of the applicable statute of limitations. (Stip. at ¶ 101.) Approximately $2 million of the Delamination claims were rejected because (a) defendant determined they were time-barred and (b) defendant concluded plaintiff did not handle those claims reasonably. (Stip. at ¶ 106-107.) Finally, other claims were denied on the basis of inadequate documentation. (Stip. at ¶ 104-105.)

## III. LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and

5

resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant a motion for summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## IV. DISCUSSION

There are three overall claims at issue in the motions. The core dispute involves the application of the statute of limitations. This issue raises a number of related, disputed issues, including whether the GA Agreement contained a condition precedent, whether plaintiff unreasonably delayed submitting certain bordereaux, and the applicability of the standstill agreement. Both parties separately move for summary judgment on these issues. Second, plaintiff moves for summary judgment on its Delamination claims and its claim that defendant improperly required more documentation than required by the GA Agreement.[2] Each issue will

---

[2] Plaintiff also seeks prejudgment interest at the statutory rate of 6% per annum on its alleged damages. In contract cases, prejudgment interest is awardable as of right. *Daset Mining Corp. v. Industrial Fuels Corp.,* 473 A.2d 584, 595 (Pa. Super. Ct. 1984). Prejudgment interest is

be considered in turn.

### A. Statute of Limitations

The parties agree that the applicable statute of limitations is four years. *See* 42 Pa. Cons. Stat. § 5525(a)(3). They cannot, however, agree on when the statute of limitations began to run. Defendant argues that the statute of limitations began to run when plaintiff suffered a loss – when plaintiff made a payment under its policies. Plaintiff counters that the statute of limitations only began to run when defendant denied its bills. Further, the parties disagree about whether the GA Agreement contained a condition precedent. Because the Court concludes the existence of a condition precedent in the contract to be dispositive, it need not resolve the parties' disagreement about the other potential triggers for the statute of limitations.

#### a. Condition Precedent

The statute of limitations for breach of an unwritten contract under Pennsylvania law is four years. 42 Pa. Cons. Stat. § 5525(a)(3). "The statute of limitations begins to run at the time the cause of action accrues. Under Pennsylvania law, in an action for breach of contract, the action accrues when the contract is breached." *McCarthy v. Scottsdale Ins. Co.,* 1999 WL 672642, at *2 (E.D.Pa. Aug.16, 1999). However, "[i]f a contract is conditional, the statute of limitations runs from the time the condition is performed or exists." *Kucera v. Metro. Life Ins. Co.*, 719 F.2d 678, 681 (3d Cir. 1983) (citing *Tonkin v. Baum,* 114 Pa. 414, 7 A. 185 (1886)).

The parties disagree about whether the GA Agreement contained a condition precedent. The inquiry is made difficult because the GA Agreement was never formalized in writing. However, the parties have stipulated to a number of provisions in the contract, including that "the

---

calculated from the date on which payment became due. *Fernandez v. Levin,* 548 A.2d 1191, 1193 (Pa. 1988). The award of interest in a contract action is a matter of right regardless of when it is demanded, or whether it is demanded. *Id.* In the event plaintiff recovers damages in this action, it is entitled to prejudgment interest of 6% per annum. *See* 41 Pa. Cons. Stat. § 202.

UK Entity did not precondition payment on any documentation requirements *other than the submission of bordereaux* which were validated by UK Entity." (Stip. at ¶ 44.) (emphasis added) A plain reading of this provision of the GA Agreement, as formalized in the parties' stipulation, conditions defendant's payment of bills from plaintiff upon receipt and validation of a bordereaux by defendant's predecessor-in-interest, and that provision is binding on defendant. Accordingly, the Court concludes that the submission of the bordereaux was a condition precedent in the GA Agreement, and the statute of limitations will run from the performance of that condition precedent.

      b. <u>Reasonableness of Delay in Submitting Bordereaux</u>

The Court must still decide whether plaintiff's delay in submitting to defendant bordereaux containing "catch-up" billings was reasonable. "In such cases where a demand is necessary to perfect the cause of action and the time of the demand is within the plaintiff's control, the demand must be made within a reasonable time. The plaintiff cannot 'arrest the running of the statute … for his own convenience.'" *Gurenlian v. Gurenlian*, 595 A.2d 145, 150 (Pa. Super. Ct. 1991) (citing *Bell v. Brady*, 31 A.2d 547, 550 (Pa. 1943)). This principle is "applicable only where the liability is contractual." *Freeman v. Rogal*, 40 A.2d 853, 854 (Pa. 1945).

Buttressing the requirement that plaintiff submit a bordereaux within a reasonable time, the GA Agreement also contained an Errors and Omissions clause. (Stip. at ¶ 85; Defendant's Supplemental Answers and Objections to the First Set of Interrogatories of OneBeacon at ¶ 3.) The parties agree that the Errors and Omissions clause stated that defendant "shall not be relieved of liability because of an error or accidental omission of the [plaintiff] in reporting any claim or loss or any business reinsured under this Agreement, provided that the error or omission is rectified as soon as commercially reasonable after discovery." (Pl. Exhibit CC.)

Defendant argues that plaintiff was negligent when it failed to demand the payments at issue for as long as five or six years. It points to statements by plaintiff's employees reflecting their realization that not all claims were being billed to defendant in the years before 2005. Defendant argues that plaintiff had the information to realize it wasn't billing defendant fully between 1999 and 2005 but failed to take reasonable steps to correct its billing errors. Thus, defendant argues that the demand was not made in a "reasonable time" due to plaintiff's own negligence.

Plaintiff counters that it did act reasonably and argues that it did manual billing adjustments for a number of years as it integrated computer systems of two different companies, which were merging. It claims that it realized in 2004 or 2005 there were billing errors and promptly notified defendant.

Based on the present record, there is a genuine dispute of material fact as to whether plaintiff's delay in billing defendant was reasonable, which precludes the entry of judgment for either party. In any case, the Court must still determine the applicability of the standstill agreement which affects only certain bills.

    c. Standstill Agreement

In response to the delayed "catch-up" billings, the parties agreed to a standstill agreement effective August 3, 2006. The standstill agreement tolled the statute of limitations for the May and June 2005 "catch-up" billings. It remained in effect until December 24, 2010, and the instant lawsuit was filed on December 27, 2010.

Thus, if plaintiff's delay in submitting the May and June 2005 "catch-up" billings was reasonable, the standstill agreement tolled the statute of limitations from August 3, 2006 to December 24, 2010. Accordingly, the claims regarding the May and June 2005 "catch-up"

billings would be timely. On the other hand, if plaintiff's delay was not reasonable, those bills in the May and June 2005 "catch-up" billings that arose out of policy payments more than 4 years before the filing of the lawsuit – i.e. before August 6, 2002, when taking into account the standstill agreement – would be barred by the statute of limitations. Further, the standstill agreement did not apply to the 2006 "catch-up" billing, submitted in October 2006, which is therefore barred by the four year statute of limitations, regardless of whether plaintiff's delay as to the claims in that billing was reasonable.

        d.   Conclusion as to the Statute of Limitations

The GA Agreement between the parties required plaintiff to submit a bordereaux as a condition precedent under the contract to receive payment. The fulfillment of that condition precedent began the running of the four year statute of limitations for any disputed bills, although the statute of limitations was tolled for the May and June 2005 "catch-up" billings from August 3, 2006 to December 24, 2010. Thus, any claims relating to bordereaux, other than those in the May and June 2005 "catch-up" billings, submitted more than four years before the filing of this lawsuit – i.e. before December 27, 2006 – are barred by the statute of limitations, and defendant is entitled to summary judgment on such claims.

Regarding the May and June 2005 "catch-up" billings, the reasonableness of plaintiff's delay in submitting the bills to defendant controls whether those claims are time-barred. As explained above, there is a genuine dispute of material fact on this issue, and thus neither party is entitled to summary judgment regarding the May and June 2005 "catch-up" billings.

   **B.**   **Delamination Claims**

Defendant has refused to make payments for certain Delamination claims submitted by plaintiff, and plaintiff moves for summary judgment on those claims. The parties agree that the

10

"follow-the-fortunes" clause in the GA Agreement controls, but they disagree about whether the Delamination claims are subject to it.

"The follow-the-fortunes doctrine insulates a reinsured's liability determinations from challenge by a reinsurer unless they are . . . in bad faith, or the payments are clearly beyond the scope of the original policy." *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 149 (3d Cir. 2010) (applying New York law). The burden is on the reinsurance company to establish the exceptions to the "follow-the-fortunes" doctrine. *Id*.

The parties agree that there is no allegation that payments under the policy were made in bad faith. (Stip. at ¶ 82.) However, they disagree about whether the payments were "clearly beyond the scope" of the policy. Plaintiff had solicited the legal opinion from a law firm about trigger of coverage under the policy with Burmah Castrol, but the April 1999 letter was "inconclusive as to both jurisdiction and policy trigger issues." (Stip. at ¶ 71.) Thus, plaintiff argues it was unclear whether Delamination claims submitted after June 30, 2001, when the coverage was non-renewed, were still covered by the policy. Therefore, plaintiff argues that defendant cannot show that the payments were "clearly beyond the scope" of the policy, and it is entitled to summary judgment on this issue.

Defendant counters by pointing to testimony from plaintiff's corporate designee, who admitted that plaintiff paid some Delamination claims without regard to whether they were within the scope of the policy or not. Defendant also offers an expert, who opines that plaintiff did not handle the delamination claims in a reasonable fashion and violated its duty of utmost good faith to defendant.[3]

---

[3] Plaintiff attacks defendant's expert's opinion, pointing to his testimony which appears to place the burden on plaintiff to show that the payments were within the policy, which would be at odds with the law of the "follow-the-fortunes" doctrine. *See Travelers Cas. & Sur. Co.*, 609 F.3d at

Based on the present record, there is a genuine dispute of material fact as to whether the Delamination claims fall within the "follow-the-fortunes" provision of the GA Agreement or whether an exception to that doctrine excuses defendant's non-payment of the claims. Therefore, plaintiff's motion for summary judgment on this issue is denied.

### C. Additional Documentation Requirement

The parties disagree about whether after 2001, plaintiff was required to submit further documentation beyond a bordereaux to defendant for payments. After 2001, defendant's agent – RMI – began to request more documents in addition to a bordereaux to make payments. Plaintiff did not expressly agree to these new requirements, but it did attempt to provide some additional documents. Plaintiff argues that defendant could not unilaterally modify the GA Agreement to include a new pre-condition before payment.

Defendant counters that plaintiff voluntarily complied with the new documentation requirements by submitting some of the requested supporting documentation, which had the legal effect of modifying the contract through the course of conduct of the parties. Indeed, the parties stipulate that plaintiff did provide "some of the requested documentation to RMI." (Stip. at ¶¶ 47, 99.)

"A written agreement may be modified, of course, by a subsequent oral agreement and this modification may be shown by words or conduct, or both." *Betterman v. Am. Stores Co.*, 80 A.2d 66, 71 (Pa. 1951). "Of course, the subsequent modification must be clearly established." *Id*.

Based on the present record, there is a genuine dispute of material fact as to whether the parties agreed to modify the GA Agreement, which precludes summary judgment for plaintiff on

---

149. Plaintiff asks that defendant's expert's opinion be rejected on this ground, although plaintiff admits it has not filed a *Daubert* motion to preclude the expert's testimony. Because the Court concludes that summary judgment on this issue is inappropriate at this time, it does not address this argument.

this issue.

## V. CONCLUSION

Based on the foregoing, defendant's Motion for Summary Judgment is granted as to all bills submitted more than four years before the filing of this action which were not subject to the standstill agreement. Defendant's Motion for Summary Judgment is denied in all other respects. Plaintiff's Motion for Summary Judgment is granted with respect to plaintiff's claim for prejudgment interest on any damages it may recover. Plaintiff's motion is denied in all other respects.

An appropriate order follows.